<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **AXLETREE SOLUTIONS, INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **INTELLECTEU, INC.**, *et al.*, <br><br> Defendants. | Civil Action No. 24-11431 (ZNQ) (TJB) <br><br> **OPINION** |

<u>**QURAISHI, District Judge**</u>

**THIS MATTER** comes before the Court upon a Motion for Preliminary Injunction filed by Plaintiff Axletree Solutions, Inc. ("Axletree"). ("Motion", ECF No. 1-5.) Axletree filed a brief in support of its Motion. ("Moving Br.", ECF No. 1-1.) Defendant IntellectEU, Inc. filed an opposition.[1] ("Opp. Br.", ECF No. 19.) Axletree replied. ("Reply", ECF No. 27.)

The Court conducted an evidentiary hearing on the record on February 13, 2025. Having considered the parties' submissions, as well the witness testimony and oral argument of counsel at the hearing, the Court will **DENY** the Motion for a Preliminary Injunction for the reasons set forth below.[2]

---

[1] After IntellectEU, Inc. filed its opposition to the Motion, the parties entered into a stipulation (ECF No. 21) permitting Axletree to file an Amended Complaint that joined IntellectEU, NV as a second defendant (ECF No. 24). IntellectEU, Inc. is a subsidiary of IntellectEU, NV. (ECF No. 24 ¶ 6.)

[2] As required, this Opinion reaches certain findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172 (3d Cir. 1990). To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

1

I.  **BACKGROUND AND PROCEDURAL HISTORY**

Axletree offers financial software services that provide "a wide range of SWIFT related services, as well as bank connectivity services, treasury automation services, enterprise integration services and regulatory compliance services." (First Amended Verified Complaint ("FAVC") ¶ 11, ECF No. 11.) IntellectEU sells customized software. (*Id*. ¶ 23.)

A.  **THE PARTIES' AGREEMENTS**

It is undisputed that in 2017, the parties entered into a Purchase and Sale Agreement ("2017 Agreement") whereby Axletree purchased IntellectEU's "Intellect Distribution System software" ("IDS Software") for re-sale to Axletree's customers as "Symmetree." (*Id*. ¶ 26.) Among its terms, the 2017 Agreement includes certain covenants not to compete and confidentiality terms. (*Id*. ¶¶ 45, 46).

It is also undisputed that in 2019 the parties entered into a subsequent Services Agreement ("2019 Agreement"). The 2019 Agreement omits the prior covenants not to compete, but does maintain confidentiality terms. (ECF No. 19-3.) In relevant part, the 2019 Agreement also includes an integration clause. (*Id*. ¶ 11.)

B.  **THE PARTIES' DISPUTE**

In August 2023, IntellectEU advised Axletree that IntellectEU was considering selling a new software product, "CAT-IM," to IntellectEU customers that use SWIFT. (FAVC ¶¶ 56–57.) Axletree alleges that CAT-IM and Symmetree are in direct competition because the two provide the same essential functions and are offered to the same clients. (*Id*. ¶ 58–59, 61.) When Axletree communicated its concerns, IntellectEU responded in December 2023 by offering the following suggestions: 1) Axletree could update Symmetree itself, or 2) Axletree could pay IntellectEU to rebuild Symmetree, or 3) Axletree could migrate their clients to CAT-IM. (*Id*. ¶ 64.) In April

2024, Axletree restated its concerns regarding competition after IntellectEU presented CAT-IM at a public seminar. (*Id*. ¶ 65.) From August 2024 through October 2024, Axletree requested that IntellectEU cease and desist its marking of CAT-IM in order to avoid litigation. (*Id*. ¶ 67.) On November 7, 2024, IntellectEU responded that it was terminating its relationship with Axletree. (*Id*. ¶ 68.) On December 23, 2024, Axletree filed its initial Verified Complaint and the Motion. (ECF No. 1.)

The First Amended Verified Complaint asserts seven counts: Breach of Contract (Count 1); Breach of the Implied Covenant of Good Faith and Fair Dealing (Count 2); Tortious Interference with Business Relations and Expectancy (Count 3); Unfair Competition (Count 4); Violation of New Jersey Trade Secrets Act (Count 5); Violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 (Count 6); and Declaratory Relief (Count 7).[3] (*See generally* FAVC.)

With respect to the Motion, the Court conducted a telephonic case management conference on January 2, 2025, during which it set a hearing on the Motion for February 13, 2025. (ECF No. 7.)

On February 13, 2025, the Court conducted an evidentiary hearing. Axletree presented testimony from two witnesses: Mohan Murali, co-owner and CEO of Axletree, and Omar Rodriguez, former business development manager for IntellectEU. IntellectEU also presented two witnesses: Dirk Avau, its founder and CEO, and Oleg Borovyk, its head of engineering.

---

[3] At the hearing, Plaintiff's counsel clarified that Axletree is not seeking preliminary injunctive relief based on all seven of the counts asserted in the First Amended Verified Complaint. Notably, it is not seeking relief based on Counts 4, 6 or 7. (Hearing Tr. 58:1–18.)

## II. SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1332 because Axletree asserts at least one claim based on federal law, and because the parties are diverse and the amount in controversy exceeds $75,000.

## III. THE FEBRUARY 13, 2025 HEARING

In assessing the credibility of each witness in this case, the Court has taken into consideration how well each witness was able to recall and describe the things testified to, the manner of the witness while testifying, whether the witness had an interest in the outcome of the case or any bias or prejudice concerning any party or matter involved in the case, and how reasonable the witness's testimony was considered in light of all the evidence in the case. *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 335 n.1 (D.N.J. 2002) (citations omitted).

### A. WITNESS TESTIMONY: MOHAN MURALI (HEARING TR. 9–96 )

Mohan Murali testified in person at the hearing. He is the CEO and co-owner of Axletree. (Murali Dec. ¶ 1, ECF No. 27; Hearing Tr. 10:14–16.) Murali testified as to the reasons Axletree filed this suit and the timing of its filing. He also testified as to the similarities between the parties' products and their position in the relevant market. Based upon Murali's demeanor, manner in which he testified, and substance of his testimony in conjunction with other corroborative evidence, the Court found his testimony to be credible and assigns it substantial weight.

### B. WITNESS TESTIMONY: OMAR RODRIGUEZ (HEARING TR. 98–104)

Omar Rodriguez testified in person at the hearing. He was employed by IntellectEU as a business development manager from 2022 through 2024. (Hearing Tr. 98:24–99:5.) Prior to that, Rodriguez worked for SWIFT for almost 15 years. (*Id*. 99:13–18.) From late 2023/early 2024,

4

Rodriguez managed the Axletree account and also promoted CAT-IM. (*Id*. 99:19–100:2.) He now has his own consulting company providing advisory and consulting services. (*Id*. 100:10–18.) Axletree is one of its client and his company has helped it promote Symmetree. (*Id*.) Rodriguez testified that, based on his experience, Symmetree and CAT-IM are in competition. (*Id*. 100:19–101:14.) Based upon Rodriguez's demeanor, manner in which he testified, and substance of his testimony, the Court also found his testimony to be credible and assigns it substantial weight.

### C. WITNESS TESTIMONY: DIRK AVAU (HEARING TR. 114–148)

Dirk Avau testified in person at the hearing. He is the founder and CEO of IntellectEU. (Hearing Tr. 115:13–16.) He testified as to his company in general as well as its relationship with Axletree. He also described his understanding of the parties' agreements and the differences between the parties' products. He also testified as to the development of the parties' dispute that resulted in this suit. Based upon Avau's demeanor, manner in which he testified, and substance of his testimony, the Court found his testimony to be credible and assigns it substantial weight.

### D. WITNESS TESTIMONY: OLEG BOROVYK (HEARING TR. 148–160)

Oleg Borovyk also testified in person at the hearing. He is the "head of engineering" at IntellectEU. (Hearing Tr. 148:18–20.) He testified as to differences between Symmetree and CAT-IM in terms of architecture, deployment, work flow management, and scalability. (*Id*. 149:7–156:4.) Based upon Borovyk's demeanor, manner in which he testified, and substance of his testimony, the Court found his testimony to be credible and assigns it substantial weight.

## IV. LEGAL STANDARD

Injunctive relief is an "extraordinary remedy." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (citation omitted). A district court must weigh four factors when considering a request for a preliminary injunction:

"(1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party[;] and (4) whether the relief is in the public interest." *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.*, 39 F.4th 95, 102–03 (3rd Cir. 2022) (quoting *Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir. 2002)). The first two factors are the "most critical." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (citation omitted). Only after the moving party makes a threshold showing that these two factors are met will the district court determine "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (citation omitted); *see also ADP, LLC v. Rafferty*, 923 F.3d 113, 120 (3d Cir. 2019).

V.  **DISCUSSION**

   A.  **LIKELIHOOD OF SUCCESS ON THE MERITS**

Axletree presses four claims in support of its motion for a preliminary injunction. The Court considers them below.

   1.  Breach of Contract (Count 1) (non-compete)

In support of its request for relief on a breach of contract theory, Axletree cites two provisions of the 2017 Agreement set forth below.

> C.  **Covenant Not to Compete with Regard to IDS**
>
> Intellect EU covenants and agrees, which covenant and agreement is made the essence of this Agreement[,] that IntellectEU will not, during the Term of this Agreement and for five (5) years following the termination of this Agreement, for any reason:
>
> 1. On behalf of anyone or any entity, program, create, license, patent, trademark, solicit, market, sell or promote software products that are the same or similar to IDS or Symmetree.

6

> 2. Will not become interested in or associated, as an owner, principal, agent or employee with any entity that programs, creates, solicits, markets, sells or promotes software products that are the same or similar to the IDS or Symmetree.
>
> 3. . . . IntellectEU shall not engage in pre-sales and commercial activities of competing products that might be viewed as conflict of interest with IDS and Symmetree unless mutually agreed.

(Moving Br.[4] at 8; 2017 Agreement Article X(B), ECF No. 1 at 42.)[5]  Accordingly, the 2017 Agreement includes covenants against both competition and solicitation of clients.

Axletree contends that IntellectEU is breaching these provisions by virtue of IntellectEU's activities with respect to CAT-IM.  (Moving Br. at 8–9; FAVC ¶¶25, 56–62, 80–83, Count I ¶4; Murali Testimony, Hearing Tr. 32:22–41:9; Rodriguez Testimony, Hearing Tr. 100:23–102:15.) Axletree asserts that IntellectEU's activities are damaging Axletree's core business and will continue to do so.  (Murali Dec. ¶¶54–57; FAVC Count I ¶7.)  Axletree also asserts that it complied with its obligations under the 2017 Agreement.  (FAVC ¶¶52–53; Count I ¶3.)

Defendant responds that the 2017 Agreement was superseded by the 2019 Agreement, which lacks the pivotal covenants.  In its view, the 2019 Agreement was clearly intended to supersede the 2017 Agreement for two reasons.  (Opp. Br. at 5.)  First, the 2019 Agreement states the following among its whereas clauses:

> WHEREAS, Axletree has previously engaged IntellectEU for similar services and now desires to retain IntellectEU to provide the said services, and IntellectEU is willing to perform such services under the terms and conditions hereinafter set forth:

---

[4] The Court cites to the parties' submissions by their internal pagination rather than the one imposed by the Court's CM/ECF system.

[5] For the purposes of maintaining a clear record, the Court notes that although Plaintiff's Moving Brief cites this provision as Article X(B), the copy of the 2017 Agreement attached as Exhibit A to the Motion shows it as Article X(C).

(2019 Agreement at 1; ECF No. 19-3.)  Second, the 2019 Agreement includes the following integration clause:

> 11. <u>Entire Agreement.</u>  This Agreement, including and together with any related Statements of Work, exhibits, schedules, attachments and appendices, *constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding such subject matter*.  The Parties acknowledge and agree that if there is any conflict between the terms and conditions of this Agreement and the terms of conditions of any Statement of Work, the terms and conditions of this Agreement shall supersede and control.

(2019 Agreement ¶ 11) (emphasis added).  IntellectEU asserts that because the 2019 Agreement controls and lacks any provisions prohibiting competition or solicitation, those terms were no longer part of the parties' understanding.  (Opp. Br. at 6; Avau Testimony, Hearing Tr. 118:18–119:15.)  For purposes of the Motion IntellectEU separately argues that, at best, the 5-year term for the covenants concluded in January 2024—five years after the 2019 Agreement was executed—assuming the 2019 Agreement is considered to have terminated rather than superseded or rescinded the 2017 Agreement.  (Opp. Br. at 6.)

Axletree maintains that it never intended to lose the benefit of the covenants of the 2017 Agreement.  (Murali, Hearing Tr. 21:20–23:6; Reply at 9–10; .)  Its CEO testified that the 2019 Agreement was initiated by IntellectEU and that he did not understand that it was terminating the 2017 Agreement.  (Murali, Hearing Tr. 26:3–26:22, 29:9–15.)  From Axletree's perspective, there was therefore no meeting of the minds between the parties on this issue.  (Reply at 10.)

To establish a *prima facie* claim for breach of contract in New Jersey[6], a plaintiff must show "(1) a contract [existed] between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007); *Goldfarb v. Solimine*, 245 N.J. 326, 338 (2021).

"Under New Jersey contract law, a contract term is generally binding if 'the contract has been mutually agreed upon by the parties, is supported by valid consideration, and does not violate codified standards or offend public policy.'" *Weisman v. New Jersey Dept. of Human Services*, 982 F. Supp. 2d 386, 394 (D.N.J. 2013) (quoting *Hoffman v. Supplements Togo Mgmt., LLC,* 18 A.3d 210, 216 (N.J. App. Div. 2011). For a mutual agreement, there must be a meeting of the minds, which "signifies that each party to the contract must have been fairly informed of the contract's terms before entering into the agreement." *Id*. (citation omitted).

Of particular relevance to this matter, "[a] party who enters into a written contract, without being induced by fraud or 'imposition being practiced upon him, is conclusively presumed to understand and assert to its terms and legal effect.'" *Id*. (quoting *Baig v. Nuclear Regulatory Comm'n,* Civ. No. 10–0842, 2013 WL 1558707, at *3 (D.N.J. April 10, 2013) (quoting *Rudbart v. N. Jersey Dist. Water Supply Comm'n,* 127 N.J. 344, 348 (1992)); *see also Raiczyk v. Ocean Cnty. Veterinary Hosp.,* 377 F.3d 266, 270 (3d Cir. 2004) ("[I]t is well settled that signing a contract creates a 'conclusive presumption that the signer read, understood, and assented to its terms.'") (quoting *Fleming Cos., Inc. v. Thriftway Medford Lakes, Inc.*, 913 F. Supp. 837, 842–43 (D.N.J. 1995)). That is, unless there is some mistake, fraud, duress, or other "imposition," the

---

[6] The 2017 Agreement includes a choice of law provision that invokes the laws of New Jersey. (2017 Agreement XVI(K).) The 2019 Agreement, however, ambiguously cites both to the laws of New Jersey and New York. (2019 Agreement ¶ 20.) The parties' briefing uniformly cites to New Jersey law. Accordingly, the Court applies New Jersey law for the purposes of the Motion.

unambiguous terms of the settlement agreement are binding. And, "[w]hile rescission may be available in cases of unilateral mistake, such relief cannot be granted where the mistake occurs as a result of the mistaken party's own negligence."[7] *Id*. (quoting *Baig,* 2013 WL 1558707, at *3).

Here, the parties do not dispute that Axletree voluntarily entered into a business relationship with IntellectEU. Likewise, they do not dispute that Murali, on behalf of Axletree, signed a written contract in the form of the 2019 Agreement. Finally, there is no dispute that each party exchanged a bargained-for promise.

Thus, the Court need only consider whether there is some ambiguity that precluded a meeting of the minds and would therefore invalidate the 2019 Agreement, or its omission of the prior covenants. The Court finds no such ambiguity. The 2019 Agreement clearly states in its whereas clause that Axletree was agreeing to retain IntellectEU "under the terms and conditions hereinafter set forth" and that the 2019 Agreement reflected the parties' entire agreement. There may have been significance to the omission of the covenants from the prior 2017 Agreement, but there was no ambiguity. Accordingly, Axletree has failed to show that it should not be bound by the 2019 Agreement that it signed.

Likewise, Axletree has not shown why it is entitled to rescission of the 2019 Agreement. On cross-examination at the hearing, Axletree conceded three noteworthy points: 1) that it was not aware whether one of its senior executives had negotiated any part of the 2019 Agreement, 2) that its CEO had not seen it prior to receiving it for execution and that he did not read it until several

---

[7] Negligence precludes meeting the third of the four conditions that must be present to grant rescission of a contract due to unilateral mistake: (1) The mistake must be of so great a consequence that to enforce the contract as actually made would be unconscionable; (2) the matter as to which the mistake was made must relate to the material feature of the contract; (3) the mistake must have occurred notwithstanding the exercise of reasonable care by the party making the mistake, and; (4) it must be able to get relief by way of rescission without serious prejudice to the other party, except for loss of his bargain. *Contreras v. United States*, Civ. No. 19-12870, 2022 WL 970192, at *X (D.N.J. March 31, 2022).

10

months later, and 3) that Axletree did not have it reviewed by an attorney prior its execution (although its counsel did review the 2017 Agreement prior to its execution). (Murali, Hearing Tr. 29:3–12, 74:25–76:15.) Moreover, according to Axletree the stakes were high. It repeatedly emphasizes in its submissions and its testimony that Axletree had committed substantial resources to Symmetree and that the omitted covenants were significant to protecting its interests.

Based on this limited record, given the circumstances, Axletree's failure to exercise reasonable care to review the contents of the 2019 Agreement means that it has not shown that it is likely to obtain rescission based on the doctrine of unilateral mistake. That doctrine provides no recourse for a mistaken, negligent party. The Court therefore finds that Axletree has not shown it is likely to succeed on its breach of contract claim.[8]

2. <u>Breach of the Implied Covenant of Good Faith and Fair Dealing (Count 2)</u>

Axletree argues in the alternative that IntellectEU's conduct breached the implied covenant of good faith and fair dealing. (Moving Br. 12–14.)

It is black letter law that "every contract in New Jersey contains an implied covenant of good faith and fair dealing." *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420–21 (1997) (citations omitted). This is an "implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words . . . ." *Id*. (citations omitted).

However, "[t]he implied duty of good faith and fair dealing does not operate to alter the clear terms of an agreement and may not be invoked to preclude a party from exercising its express rights under such an agreement." *Fleming,* 913 F. Supp. at 846  Where the terms of a contract are not specific, the implied covenant of good faith and fair dealing may fill in the gaps where

---

[8] The Court does not reach IntellectEU's alternative argument that the 2019 Agreement expired in January 2024.

11

necessary to give efficacy to the contract as written. *Fields v. Thompson Printing Co.,* 363 F.3d 259, 272 (3d Cir. 2004). "But where the terms of the parties' contract are clear, the implied covenant of good faith and fair dealing will not override the contract's express language." *Armur Realty, LLC v. Banco do Brasil, S.A.*, Civ. No. 09-2792, 2011 WL 1327422, at *3 (D.N.J. Apr. 5, 2011) (citing *Fields*, 363 F.3d at 272).

Here, Axletree had explicit covenants against competition and client solicitation in the 2017 Agreement, but it gave them up in the 2019 Agreement. The 2019 Agreement is clear. Therefore, the Court will not read the covenants back into the 2019 Agreement. Accordingly, the Court finds that Axletree has not shown a likelihood of success on its claim based on an implied covenant.

                3.     <u>Claims Based on IntellectEU's Possession of Axletree's Confidential Information: Breach of Contract (Count1) and Violation of New Jersey Trade Secrets Act (Count 5)</u>

At the hearing, Axletree clarified that it is not seeking injunctive relief against the marketing of CAT-IM based on IntellectEU's purported breach of the confidentiality terms of the parties' agreements. (Hearing Tr. 173:1–5.) It is instead seeking an order that IntellectEU return its proprietary information.

For its part, IntellectEU has maintained that it has already returned all of Axletree's proprietary information. (Hapon Decl. ¶¶ 18–22; Hearing Tr. 170:19.) Based on the representations of counsel at the hearing, and with IntellectEU's consent, the Court agreed that it would order the return of Axletree's "confidential proprietary information or code, not within [IntellectEU's] program but additional things like the [customer] list or other documents or information from [Axletree]." (Hearing Tr. 173:15–174:5.) Therefore, the Court does not consider further Axletree's claim for breach of contract based on breach of the relevant confidentiality provisions, at least for the purposes of the present motion.

Although neither party raised it at the hearing, the Court reaches the same conclusion with respect to Axletree's claim for violation of the New Jersey Trade Secrets Act ("NJTSA" Count 5). There are parallels between the two claims. The allegations supporting the NJTSA claim similarly accuse IntellectEU of continuing to "misappropriate, retain and misuse Proprietary Information of Axletree for IntellectEU's own benefit in furtherance of its competition with Axletree." (FAVC ¶ 5.) The NJTSA claim likewise seeks comparable relief: "Axletree is entitled to affirmative action to protect its Proprietary Information including retain [sic, return] of all documentation and information given to and taken by IntellectEU and the return or destruction of any documents and files, digital as well as paper, that contains such Proprietary Information." (FAVC ¶ 11.) Insofar as the parties have agreed to an order requiring that IntellectEU return Axletree's proprietary information, the Court does not consider the NJTSA claim further, at least in the context of the pending motion for preliminary injunction.

4. <u>Tortious Interference with Business Relations and Expectancy (Count 3)</u>[9]

In relevant part, the First Amended Verified Complaint accuses IntellectEU of two categories of allegedly tortious conduct. One is "continuing to use the Proprietary Information and other information obtained from Axletree via the Confidentiality Provision in the [2017] Agreement." (*Id*.) Regarding the purported direct and current use of the Proprietary Information,

---

[9] On its face, Count 3 encompasses two theories, but New Jersey courts do not draw a distinct line between actions for tortious interference with prospective economic advantage and for tortious interference with existing business relationships. *See Singer v. Beach Trading Co., Inc.,* 379 N.J. Super. 63, 81, 876 A.2d 885 (App. Div. 2005); *see also Carpet Group Intern. v. Oriental Rug Importers Ass'n Inc.,* 256 F. Supp. 2d 249, 288 (D.N.J. 2003) ("The requirements of each claim are identical except that the tortious interference with contractual relations claim requires proof of an existing contract.").

13

as set forth above, the parties have agreed that the Court will enter an Order requiring the return of any such information.[10]

The second category of accused tortious conduct is interfering with Axletree's "quotes, opportunities, and expectancies through [IntellectEU's] continued marketing and sales of CAT-IM and IntellectEU's efforts to solicit customers to purchase CAT-IM that are also potential customers of Axletree." (FAVC Count 3, ¶ 4.; *see also* Moving Br. at 15.)

To prevail on a claim for tortious interference with prospective business advantage, a plaintiff must show: (1) it had a "reasonable expectation of economic advantage"; (2) "the interference was done intentionally and with 'malice'"; (3) "the interference caused the loss of the prospective gain"; and (4) "the injury caused damage." *Printing Mart-Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 751–52 (1989); *Veverka v. Royal Caribbean Cruises Ltd.*, 649 F. App'x 162, 168 (3d Cir. 2016).

"[T]he term malice is not used in the literal sense requiring ill will toward the plaintiff." *Printing Mart*-Morristown, 116 N.J. at 751 (citation omitted, interior quotation marks omitted.) "Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Id*. (citation omitted, interior quotation marks omitted.) Indeed, the admittedly "amorphus" element of "wrongful, unjustified conduct," is a flexible standard "and must focus on a defendant's actions in the context of the case presented." *Id*. "[T]he relevant inquiry is whether the conduct was sanctioned by the 'rules of the game,' for where a plaintiff's loss of business is merely the incident of healthy competition, there is no compensable tort injury." *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 306 (2001). "The line is clearly drawn at conduct

---

[10] The Court specifies "direct and current use" because to the extent IntellectEU was concerned that Axletree's submissions might be read as asserting that IntellectEU used Axletree's proprietary information to develop CAT-IM (*compare* Opp. Br. at 11 *with* FAVC; Moving Br. at 15; Reply at 13), Axletree's counsel at the hearing clarified that this was not among Axletree's current allegations. (Hearing Tr. 171:16–174:10.)

that is fraudulent, dishonest, or illegal." *Id.* at 307. "[T]he gravamen of a claim for tortious interference with prospective advantage . . . is that the defendant's conduct was somehow legally wrongful." *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.,* 659 A.2d 904, 935 (N.J. Superior App. Div. 1995)

The parties primarily take opposite positions (and each introduce supporting evidence) with respect to whether CAT-IM is actually competing with Symmetry, *i.e.,* whether IntellectEU is actually interfering with Axletree's actual or prospective business. Axletree insists that because the two products perform at least some of the same primary functions for customers and the companies are pursuing the same customers who will not purchase both products, the two products are competing. Axletree's two witnesses testified credibly in support of its position on both direct and cross-examination at the hearing. (Murali (direct), Hearing Tr. 38:10–39:5, 39:12–40:4; (Murali (cross), Hearing Tr. 83:6–87:14; Rodriguez (direct), Hearing Tr. 100:23–102:15; Rodriguez (cross), Hearing Tr. 102:24–103:22.) IntellectEU steadfastly maintains that because CAT-IM is a very different product and because of this it is not competing. (Avau (direct), Hearing Tr. 121:10–122:19, 126:24–129:6; Borovyk (direct) 149:6–156:6.)

Having considered the witness testimony and the declarations filed by the parties in support of their positions, the Court finds that on balance Axletree has made a credible showing at this stage that CAT-IM and Symmetree are in fact competing. But that does not end the inquiry because the third element of its tortious interference claim also requires Axletree to demonstrate that IntellectEU did so with malice, i.e., intentionally and unjustifiably. In this regard, Axletree's case fails for the reasons set forth below.

Axletree is not asserting that IntellectEU stole its proprietary information; Axletree willingly provided it to IntellectEU under the parties' confidentiality terms. Nor is Axletree

15

asserting that IntellectEU has used its proprietary information to develop CAT-IM. Even if it were, the Court finds Axletree has not made a sufficient showing in this regard. Axletree effectively concedes that it has no direct evidence of this misuse because it has not yet studied CAT-IM in detail. (Murali Decl. ¶ 40 "The true extent of the differences between the software tools, coding and architecture are not known at this time as Axletree has not reverse engineered CAT-IM.") Moreover, the Court finds that Axletree's circumstantial evidence is lacking, at least at this stage, based on the largely unrebutted evidence of the substantial functional differences between CAT-IM and Symmetree. Finally, Axletree is not asserting that IntellectEU has been using Axletree's funding to develop CAT-IM. On the latter point, Axletree conceded on cross examination that it "didn't pay money for this public cloud development." (Murali 90:13–16.) In short, there is no basis to support that IntellectEU's development and marketing of CAT-IM has been wrongful. For this reason, the Court finds that Axletree has not shown that it is likely to succeed on its tortious interference claim.

### B.   IRREPARABLE HARM

Axletree asserts that, unless IntellectEU is enjoined, its solicitation of Axletree's clients and its marketing of CAT-IM will destroy Axletree's business because the two companies are bidding against each other, and this will accelerate in 2025 and 2026 due to changes in the market that are being dictated by SWIFT. (Moving Br. at 18–20; Reply at 5–7; Murali, Hearing Tr. 40:1–9.)

As a first point, the Court finds that Axletree has failed to explain its delay in moving for the extraordinary relief it now seeks. A summary of the timeline of the parties' dispute presented in the Axletree's own verified pleading is illustrative.

16

- In August 2023, IntellectEU informed Axletree "that it was considering offering its own products and services directly to financial and non-financial institutions that utilize SWIFT." (FAVC ¶ 56.)

- In December 2023 the parties exchanged positions but failed to reconcile Axletree's competition concerns. (*Id*. ¶¶ 63–64.)

- In April 2024, IntellectEU advised Axletree it would be promoting CAT-IM at a public seminar. (*Id*. ¶ 65.) The parties again exchanged disparate views and Axletree sought to resolve what it considered "IntellectEU's blatant violation of the non-compete provision of the Agreement." (*Id*. ¶ 66; *see also* Murali email to Avau dated August 12, 2024, attached as Exhibit A to Murali Declaration, ECF No. 27-1 at 2) (copying Axletree's litigation counsel).

- Through October 2024, Axletree continued to communicate with IntellectEU regarding CAT-IM, making demands that IntellectEU cease and desist its marketing for the product. (*Id*. ¶ 67.)

- On November 7, 2024, IntellectEU terminated the parties' relationship. (*Id*. ¶ 68.)

The Court finds that Axletree's admitted delay at each phase of the parties' discussions and in ultimately filing the current motion on December 23, 2025 undermines its showing of irreparable harm.[11] *Vita-Pure, Inc. v. Bhatia*, Civ. No. 14-783, 2015 WL 1496396, at *4 (D.N.J. Apr. 1, 2015) (several months of delay before bringing a motion for a preliminary injunction "can undermine an asserted claim of imminent, irreparable harm.") This is because "preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights . . . [and] [d]elay[s] in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action." *Lanin v. Borough of Tenafly*, App. No. 12-3399, 2013 WL 936363, at *3 (3d Cir. Mar. 12, 2013) (citation omitted). In this context, this Court has found a delay of four months significant. *See Vita-Pure,* 2015 WL 1496396, at *4; *see also*

---

[11] For the avoidance of doubt, the Court has reviewed the Murali Declaration attached to Axletree's Reply. (ECF No. 27.) In his declaration, Murali expresses his view that Axletree's delay was because it was misled by IntellectEU. (Murali Decl. ¶¶73–87.) The Court finds that the declaration is self-defeating insofar as it relies on sporadic conciliatory efforts between the parties and the fact that IntellectEU maintained what Murali insists was an untenable position that the companies' two products were not competing. Murali's subjective view aside, nothing in the declaration articulates a rational basis for Axletree's delay.

*Stryker Corp. v. Hagag*, Civ. No. 21-12499, 2022 WL 3107163, at * (D.N.J. Aug. 3, 2022) (same).[12]

Even if the Court were inclined to ignore the lack of urgency in Axletree's actions, it has not substantiated its claim that its purported harm is immediate or that monetary damages cannot remedy its harms. To establish a showing of irreparable harm, Axletree must demonstrate more than a mere risk of injury; it must make "a clear showing of immediate irreparable injury." *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 205 (3d Cir.1990). Likewise, it is well settled that "[t]he availability of adequate monetary damages belies a claim of irreparable injury . . . [because] a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement." *Frank's GMC Trust Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir. 1988).

Axletree asserts loss of business in the form of potential clients now and more in the future given approaching changes in the industry. (Murali Testimony, Hearing Tr. 39:1–41:17.) These are not the kind of immediate harms that a preliminary injunction seeks to avoid. Moreover, losses to Axletree of customers and business are quantifiable losses that can be remedied with monetary damages.

For all these reasons, the Court finds that Axletree has not met its burden to establish irreparable harm, providing a second and independent basis for denying its motion.

### C. SECONDARY FACTORS: BALANCE OF THE EQUITIES AND PUBLIC POLICY

The Court has concluded that Axletree has not made a sufficient showing with respect to either of the first two factors that are both required for granting a preliminary injunction. Accordingly, the Court need not address the second two factors in this case.

---

[12]

## VI. CONCLUSION

For the reasons stated above, the Court will order IntellectEU to return any of Axletree's remaining confidential proprietary information, but the Court will otherwise **DENY** the Motion for Preliminary Injunction (ECF No. 1-5). An appropriate Order will follow.

Date: February 24, 2025

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**
